1
2
3
4
5
6
7
8
9
10
11

**United States District Court**
**For the Northern District of California**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

BINH C. TRAN,                                      No. C 08-04686 LHK (PR)

       Petitioner,                         **ORDER DENYING PETITION FOR**
                             **WRIT OF HABEAS CORPUS**
       v.

PEOPLE OF THE STATE OF
CALIFORNIA,

       Respondent.
_____/

**INTRODUCTION**

     This is a federal habeas corpus action filed pursuant to 28 U.S.C. § 2254 by a *pro se*
state prisoner.  For the reasons set forth below, the petition is DENIED.

**BACKGROUND**

     In 2006, a Santa Clara County Superior Court jury found Petitioner guilty of forcible
rape, false imprisonment, making a criminal threat, and forcible oral copulation.  The jury
also found true an allegation that Petitioner had personally used a deadly weapon in the
commission of the crime.  Consequent to the verdict, the trial court sentenced Petitioner to a
total term of twenty-four years and eight months in state prison.  Petitioner filed the instant

United States District Court

For the Northern District of California

federal habeas action after he was denied relief from the verdict on direct state review.

Evidence presented at trial shows that in 2004 and 2005, Petitioner raped Ai, his ex-girlfriend:

> [Petitioner] met Ai Doe through mutual friends in January 2003; they began dating about a month later. At some point, Ai's mother became aware that the teenage couple had a sexual relationship and they became engaged at her insistence. Ai ended the relationship in September 2004. [Petitioner] was angry and "took it really bad." Ai lived alone with her mother and despite the break-up, [Petitioner] continued to telephone Ai and to visit her mother. Ai told [Petitioner] she did not want him to visit, but she continued to talk to [Petitioner] because she pitied him and "it seemed like he needed" her.

**A.    Counts 1, 2, and 3 (Rape, False Imprisonment, and Criminal Threat)**

Early in the morning of October 2, 2004, [Petitioner] knocked on the window of the master bedroom of Ai's apartment (Ai's mother's bedroom), where Ai was sleeping. [Petitioner] showed Ai his bleeding wrists and told Ai he had ingested rat poison because he could not live without her. Ai was "shocked and confused" but "felt bad for him" and let him into the apartment. She called 911 to report the suicide attempt, but [Petitioner] ran away when the police arrived.

After the police left, [Petitioner] returned to speak to Ai through the bedroom window. He still seemed "very nervous and needy" and Ai eventually told him to go away. [Petitioner] jumped the backyard fence and entered the apartment through a sliding glass door. She again told him to leave, but he said he just wanted to sit beside her and watch her sleep. She tried to fall asleep, but he put his hands on her neck and started choking her. As he did so, he repeatedly told her he was sorry. Ai struggled and managed to pull away, but [Petitioner] shoved her back on the bed. Ai yelled for help, but [Petitioner] blocked her from leaving the room, pushing her back when she neared the door.

Ai asked [Petitioner] why he was doing this to her. He told her that "[h]e can't live without [her] and he can't bear the sight of [her] being with someone else so he rather if [they] both die." After pushing Ai back onto the bed, he "strangled [her] for a while." He pulled her pants down and after additional struggling and fighting, he raped her. Ai told him numerous times she did not want to have sex and she tried to resist by biting his face, pinching his penis, and punching him. [Petitioner] ejaculated inside Ai and when he stopped, she pulled her pants up and ran outside.

[Petitioner] followed Ai outside, and Ai double-backed to the apartment and locked the doors. [Petitioner] eventually left. Ai called a cousin, her best friend, and her mom, who was not sure if Ai should call the police. Ai did not call the police because [Petitioner] was an ex-boyfriend and she thought "he might have some sort of like psycho problem at that time" and that it was just "a one time thing."

The following Monday Ai told the school nurse she had been raped.  The nurse called the police and Ai told them what had happened.  A day later she changed her mind about pressing charges.  [Petitioner] had apologized and Ai "felt bad, pity for him."  He continued to visit her apartment and she sometimes talked to him because he was there.  They continued to attend the same school.

## B.    Count 4 (Forced Oral Copulation)

At the end of October 2004, [Petitioner] asked Ai to lunch.  She finally agreed because she had a free hour and "he seemed really needy[.]"  He had been "calm, sweet, very nice" since the earlier incident.  He stopped the car in a residential neighborhood, jumped on top of Ai, and tried to pull down her pants.  She was scared and told him she would do anything as long as he did not rape her.  [Petitioner] asked Ai to perform oral sex and she complied.  He took a picture of her and later told police he wanted it as proof that the act was consensual.  Ai was now more angry than she was scared and convinced [Petitioner] to drive her back to school.  She did not report the incident to the police because she did not want [Petitioner] sent to jail.

## C.    Count 5 (Rape)

In early January 2005, Ai let [Petitioner] into the apartment and he joined her in the master bedroom where she was watching a movie.  He wanted to get back together with her, but she told him she was not interested.  He replaced the movie she was watching with a porn video.  He then told her that [he] could not "bear seeing [her] with anyone else" and that he was "going to rape [her] and make [her] pregnant" so that she could not be with anyone else.

Ai told [Petitioner] to get out, but he shoved her down and tried to have sex with her.  He grabbed a pair of scissors, held them at her neck, and said that if she did not have sex with him, he would stab her.  She believed he would use the scissors if she did not comply.  He told Ai that he wanted to cut her face so that no one else could have her and make her pregnant so that she would have to marry him.  He also threatened to burn her face with a cigarette so that "no one else would want to look at [her]."  Ai tried pushing him a couple of times but was scared. [Petitioner] eventually managed to place his penis in Ai's vagina.

When [Petitioner] went to the restroom, Ai pulled up her pants and left the apartment by kicking out the window screen and climbing through the window.  Ai ran to her neighbor's and called her mother but did not call the police right away.

The next day, Ai went to her grandmother's house to get out of the apartment.  [Petitioner] called the house and she hung up on him.  He arrived, jumped the fence, and appeared at the back window.  Ai called the police; it had gone "too far" and she did not want [Petitioner] to harm her grandmother.

Ai and [Petitioner] submitted to sexual assault examinations that day, January 4, 2005.  [Petitioner]'s semen was found on panties Ai was wearing the day before and "[Petitioner] and Ai Doe are included as possible contributors to a mixture detected on one of Ai Doe's vaginal swabs."  The nurse who conducted the examinations observed a fresh injury on [Petitioner]'s mouth and

United States District Court
For the Northern District of California

1    a scratch on his neck.

2    (Ans., Ex. C at 2–5) (footnote removed).

3        As grounds for federal habeas relief, Petitioner alleges that (1) there was insufficient

4    evidence to support his conviction for making a terrorist threat; (2) his statements to Sergeant

5    Blank were used in violation of his right against self-incrimination; (3) his statements to

6    Officer Recinos should have been suppressed; (4) the trial court's restriction of Petitioner's

7    examination of his expert witness violated his right to due process; (5) the prosecutor

8    committed misconduct; (6) there was cumulative error; (7) the trial court violated his right to

9    due process by denying a motion for a continuance; (8) the imposition of consecutive

10   sentences violated due process;[1] and (9) his sentence violates his right to a jury trial.

**STANDARD OF REVIEW**

12       This court may entertain a petition for writ of habeas corpus "in behalf of a person in

13   custody pursuant to the judgment of a State court only on the ground that he is in custody in

14   violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

15   The petition may not be granted with respect to any claim that was adjudicated on the merits

16   in state court unless the state court's adjudication of the claim: "(1) resulted in a decision

17   that was contrary to, or involved an unreasonable application of, clearly established Federal

18   law, as determined by the Supreme Court of the United States; or (2) resulted in a decision

19   that was based on an unreasonable determination of the facts in light of the evidence

20   presented in the State court proceeding." 28 U.S.C. § 2254(d); *Harrington v. Richter*, 131 S.

21   Ct. 770, 784 (2011).

22       "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state

23   court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of

24   law or if the state court decides a case differently than [the] Court has on a set of materially

25   indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412–13 (2000).

26

27       [1] This is a consolidation of claims 8 and 9, as listed in the Petition and Answer.

28

United States District Court
For the Northern District of California

No. C 08-04686 LHK (PR)
ORDER DENYING PETITION

1    "Under the 'unreasonable application' clause, a federal habeas court may grant the

2    writ if the state court identifies the correct governing legal principle from [the] Court's

3    decision but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at

4    413. "[A] federal habeas court may not issue the writ simply because that court concludes in

5    its independent judgment that the relevant state-court decision applied clearly established

6    federal law erroneously or incorrectly. Rather, that application must also be unreasonable."

7    *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask

8    whether the state court's application of clearly established federal law was "objectively

9    unreasonable." *Id.* at 409.

10                                          **DISCUSSION**

11   **I.     Sufficiency of Evidence**

12           Petitioner claims that there was insufficient evidence to support his conviction for

13   making a criminal threat. (Pet., P. & A. at 30.) More specifically, Petitioner contends that

14   there was insufficient evidence that his statements "fairly disclose[d] an intentional,

15   unequivocal, unconditional, immediate, and specific threat." (*Id.* at 35.) The state appellate

16   court rejected this claim on grounds that substantial evidence existed to support the

17   conviction:

18           [Petitioner] told Ai "he can't live without [her] and he can't bear the sight of
             [her] being with someone else so he rather if [they] both die." The available
19           evidence regarding the surrounding circumstances supports the jury's finding
             that [Petitioner] conveyed "an immediate prospect of execution of the threat"
20           and that Ai reasonably feared for her own safety. The threat was made in the
             midst of a violent altercation between [Petitioner] and Ai. Just before making
21           the statement, [Petitioner] choked Ai until she could barely breathe. After
             stating that he would rather they both die, [Petitioner] "shoved [Ai] back on the
22           bed and strangled [her] for a while . . ." [Petitioner] continued to keep Ai in the
             bedroom against her will, and at the conclusion of the struggle, forcibly raped
23           her. [Citation removed.] Finally, Ai testified that [Petitioner] seemed serious
             when he made the statement and that it scared her.
24
             [Petitioner]'s suicidal statements and inappropriate behavior prior to the
25           statement give additional credence to the murder/suicide threat. In the weeks
             after Ai broke up with [Petitioner], he demonstrated his refusal to accept the
26           situation by visiting the house and continuing to seek her attention. Only hours
             before the threat, [Petitioner] told Ai that he ingested rat poison and cut his
27           wrists because he could not live without her. This purported suicide attempt

28

No. C 08-04686 LHK (PR)
ORDER DENYING PETITION

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1  appeared serious enough for Ai to call 911 on [Petitioner]'s behalf.

2  [Petitioner] nevertheless argues that because his actions were "[p]unctuated with apologies and mixed feelings," and because the "suicidal/homicidal ideations were never carried out[,]" his statement should not be taken as a serious threat. He characterizes it as nothing more than a "distraught response" to Ai's questioning. Even if this is a reasonable interpretation, it is not the only one that may be drawn from the evidence presented. The jury could infer from the same "distraught" statements and attendant violent actions that [Petitioner] was so emotionally disturbed that he intended that Ai take his statement seriously. The statute does not require that the threat actually be fulfilled, or even that the [Petitioner] intend to carry it out. The statute requires only that the [Petitioner] intend the statement to be taken as a threat that causes the victim to fear for his or her safety. [Citations removed.]

Finally, [Petitioner] argues that because Ai "could not be sure this was a specific threat to kill, this Court cannot be sure either." Ai testified during trial that she was unsure whether she thought he would actually kill her at the time, but that she was sure he was going to hurt her in some way. In view of the entirety of the circumstances presented, this uncertainty regarding the extent of the danger does not prevent a finding that [Petitioner] conveyed "a gravity of purpose and an immediate prospect of execution of the threat" that caused Ai "reasonably to be in sustained fear for . . . her own safety . . ."

13  (Ans., Ex. C at 7–8.)

14  A federal court reviewing collaterally a state court conviction does not determine

15  whether it is satisfied that the evidence established guilt beyond a reasonable doubt. *Payne v.*

16  *Borg*, 982 F.2d 335, 338 (9th Cir. 1992). The federal court "determines only whether, 'after

17  viewing the evidence in the light most favorable to the prosecution, any rational trier of fact

18  could have found the essential elements of the crime beyond a reasonable doubt.'" *See id.*

19  (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Only if no rational trier of fact

20  could have found proof of guilt beyond a reasonable doubt, may the writ be granted. *See*

21  *Jackson*, 443 U.S. at 324.

22  California defines a maker of a criminal threat as:

23  Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety.

28

United States District Court
For the Northern District of California

1  Cal. Pen. Code § 422.  "[U]nequivocality, unconditionality, immediacy and specificity are

2  not absolutely mandated," but "are simply the factors to be considered in determining

3  whether a threat, considered together with its surrounding circumstances, conveys those

4  impressions to the victim." *In re George T.*, 33 Cal.4th 620, 635 (2004) (internal quotation

5  marks omitted).  In determining whether an "immediate prospect of execution of the threat"

6  exists, the trier of fact may consider the parties' history and the circumstances surrounding

7  the statement, including whether it is accompanied by any "threatening gestures or

8  mannerisms." *Id.* at 637.  Because the circumstances "give meaning to the actual words

9  used," "[e]ven an ambiguous statement may be a basis for a violation of section 422." *In re*

10  *Ryan*, 100 Cal.App.4th 854, 860 (2002).

11       Applying these legal principles to the instant action, the Court concludes that

12  sufficient evidence existed in the record on which a rational trier of fact could have found the

13  Petitioner guilty of Cal. Pen. Code § 422 beyond a reasonable doubt.  According to the

14  record Petitioner (1) choked Ai until she could barely breathe, then (2) told her that that he

15  would prefer that they both be dead, rather than see her with someone else, and then

16  (3) shoved her back on the bed and strangled her again.  (Ans., Ex. C at 7.)  Ai testified that

17  Petitioner seemed serious when he made these statements and committed these acts, and that

18  she was scared.  (*Id.*)  Such evidence supports the jury's finding that Petitioner violated § 422

19  because the evidence conveys an immediate prospect of execution of the threat, and that Ai

20  reasonably feared for her own safety.

21       Petitioner does not dispute the evidence presented above, but instead offers a

22  reinterpretation of it.  Specifically, he asserts that there was insufficient evidence that he

23  made an intentional, unequivocal, unconditional, immediate, and specific threat.  This is an

24  insufficient showing to warrant habeas relief.  First, as noted above, the presence of such

25  factors is not "absolutely mandated," but rather that their presence is to be considered along

26  with surrounding circumstances.  Second, such factors are present here, petitioner having

27  strangled Ai before and after he said that he preferred that they both die rather than Ai be

28

No. C 08-04686 LHK (PR)
ORDER DENYING PETITION

1    with another man.  Accordingly, petitioner's claim is DENIED.

2    **II.     Admission of Custodial Statements**

3         Petitioner claims that the trial court violated his Fifth Amendment rights by admitting

4    into evidence custodial statements he made to a police officer, Sergeant Blank.  (Pet., P. & A.

5    at 37.)  More specifically, Petitioner contends that because of his poor knowledge of English

6    and his lack of criminal experience, he did not voluntarily, knowingly, and intelligently

7    waive his right against self-incrimination.  (*Id.* at 44.)

8         At trial, Petitioner's taped interview with Sergeant Blank was played.  During the

9    interview, Petitioner admitted (1) having sex with Ai in October 2004 and January 2005,

10   (2) choking Ai during the October incident, and (3) that Ai did not want to have sex during

11   the January incident and that though she bit him on the cheek, he continued anyway.

12   Petitioner also appeared to admit, in response to a "convoluted question," that he threatened

13   Ai with scissors.  (Ans., Ex. C at 5–6.)  According to the state appellate court,

14        [Petitioner] was apprised of his rights in a straight-forward manner, appeared to
          understand Blank's questions, and answered Blank's questions appropriately.
15        At the start of the interview, Blank informed [Petitioner] that he was "'in
          custody,' meaning, right now you're not free to go [,]" that it would be
16        [Petitioner]'s choice to speak with Blank, and that he had been arrested for rape
          but that the District Attorney might bring different charges.  Blank explained
17        that he would be reading [Petitioner] his rights and then read each one
          separately.  After Blank advised [Petitioner] of each right, [Petitioner] stated he
18        understood, and Blank moved on to the next advisement.  Blank then asked
          [Petitioner] whether he wanted to talk, [Petitioner] answered affirmatively, and
19        [Petitioner] continued to speak to Blank without objection.  At other points in
          the interview, in contrast, [Petitioner] denied Blank's allegations, corrected
20        Blank's recitation of facts, and asked Blank for clarification regarding the
          comment or question.  [Petitioner]'s conduct throughout the interview thus
21        supports the conclusion that [Petitioner] understood the advisements.

22   (*Id.* at 10–11.)

23        Prior to trial, the trial court held a hearing consequent to Petitioner's motion to

24   suppress the statements he made to Blank.  At this hearing, defense witness Dr. Amanda

25   Gregory, a neuropsychologist, testified,

26        setting forth her assessment of [Petitioner]'s language abilities including her
          conclusion that [Petitioner]'s "verbal comprehension abilities [fall] in the
27        mildly impaired range for his age."  As at trial, Gregory noted that [Petitioner]

28

No. C 08-04686 LHK (PR)
ORDER DENYING PETITION

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    has difficulty "with comprehension and expression of more complex
2    sentences[.]"  She also observed that during the interview and testing process
     he often appeared to understand what she was saying, but when prompted for a
3    response he would need to ask for clarification or simplification of the
     language.  She noted that [Petitioner] was unable to define some of the words
4    used in the police interview and that he told Gregory he thought "attorney"
     meant "translator."

5    The court denied [Petitioner]'s motion to exclude his statements to Blank,
6    finding that "[Petitioner] did understand these rights, he understood that he was
     talking to a policeman, that he understood his right to remain silent, and
7    without threat or coercion gave up the right to remain silent and spoke to the
     officer.  I find that his answers to the officer's questions were responsive and
8    adequate to give meaningful and thoughtful answers as he did to the officer."

9    (*Id.* at 10.)

10       The state appellate court rejected Petitioner's claim that he did not properly waive his

11   Fifth Amendment rights.  First, the state appellate court found that Blank gave the

12   appropriate admonitions, and that Petitioner's responses indicated that he understood those

13   admonitions.  Second, as to Petitioner's assertion that he had insufficient knowledge of

14   English and criminal law to waive his rights, the state appellate court found that

15   the prosecution in this case established that [Petitioner] is proficient in English.
     [Petitioner]'s below-average verbal comprehension presents only part of the
16   picture.  As the trial court observed in denying the motion to exclude, in over
     nine hours of testing and interviewing [Petitioner], Gregory spoke with him
17   only in English.  [Petitioner] told Gregory he was equally comfortable with
     English and Vietnamese and [Petitioner]'s academic and employment activities
18   indicate a command of conversational English.  [Petitioner] graduated from
     high school, where he was in mainstream classes (not English as a second
19   language classes), and in his freshman and sophomore years he received As
     and Bs.  Prior to his arrest, [Petitioner] attended junior college accounting and
20   real estate classes in English and worked for a mortgage company on a
     commission basis.  Finally, Gregory acknowledged that [Petitioner] may
21   understand some English words in context that he is not able to define.

22   Despite these facts, [Petitioner] suggests that his age and lack of criminal
     experience make it unlikely he knowingly waived his rights.  However, he was
23   20 years old at the time of the interview, not a particularly vulnerable age, and
     his lack of prior experience with law enforcement is simply one factor in the
24   totality of the circumstances.  These facts do not outweigh the evidence
     indicating that [Petitioner] understood his rights.

25   (*Id.* at 11–12.)

26       A person subjected to custodial interrogation must be advised that he has the right to

27   remain silent, that statements he makes can be used against him, that he has the right to

28

United States District Court
For the Northern District of California

1   counsel, and that he has the right to have counsel appointed.  *Miranda v. Arizona*, 384 U.S.

2   436, 444 (1966).  These warnings must precede any custodial interrogation, which occurs

3   whenever law enforcement officers question a person after taking that person into custody or

4   otherwise significantly deprive a person of freedom of action.  *Id.*  The remedy for a

5   violation of these requirements is the suppression, at the subsequent trial, of the statements

6   made incriminating the defendant in the crime about which he was questioned.  *Id.* at 479.

7       A person subject to custodial interrogation can waive his *Miranda* rights.  A valid

8   waiver of *Miranda* rights depends upon the totality of the circumstances, including the

9   background, experience and conduct of the defendant.  *See United States v. Bernard S.*, 795

10   F.2d 749, 751 (9th Cir. 1986).  The government must prove waiver by a preponderance of the

11   evidence.  *See Colorado v. Connelly*, 479 U.S. 157, 168–69 (1986).  To satisfy its burden, the

12   government must introduce sufficient evidence to establish that under the totality of the

13   circumstances, the defendant was aware of "the nature of the right being abandoned and the

14   consequences of the decision to abandon it."  *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

15   A showing that the defendant knew his rights generally is sufficient to establish that he

16   knowingly and intelligently waived them.  *See, e.g., U.S. v. Parra Cazares*, 121 F.3d 1241,

17   1244 (9th Cir. 1997) (recitation of rights in English and supervision of reading in Spanish,

18   accompanied by officer's confirming that defendant understood his rights, sufficient to

19   establish that defendant knew his rights and knowingly and intelligently waived them).

20   Although the burden is on the government to prove voluntariness, a waiver cannot be held

21   involuntary absent official compulsion or coercion.  *See Connelly*, 479 U.S. at 170; *Parra*

22   *Cazares*, 121 F.3d at 1244.

23       "A state trial court's determination that a defendant knowingly and intelligently

24   waived his *Miranda* rights is entitled to a presumption of correctness pursuant to section

25   2254(d)."  *Derrick v. Peterson*, 924 F.2d 813, 823 (9th Cir. 1990).  Accordingly, when

26   reviewing such a determination, a federal habeas court must determine whether it is fairly

27   supported by the record.  *Id.* at 824.

28

No. C 08-04686 LHK (PR)
ORDER DENYING PETITION

United States District Court
For the Northern District of California

1   The record fairly supports the state appellate court's determination that Petitioner

2   understood the proceedings and questions, and therefore knowingly and voluntarily waived

3   his *Miranda* rights.  For example, according to the transcript, Blank informed Petitioner that

4   he had been arrested for rape, and that evidence would be taken from Petitioner's body.

5   (Ans., Ex. A, Vol. 2 at 152–54.)  In response, Petitioner asked Blank if the evidence

6   collection would include a blood sample, whether he would spend the night in jail, and

7   whether his clothing would be returned.  (*Id.* at 154–55.)  Petitioner's responses indicate that

8   he understood his rights, including that he had the right to remain silent and have an attorney

9   present during questioning.  (*Id.* at 156–57.)

10      There is other evidence to support the conclusion that Petitioner intelligently,

11  knowingly, and voluntarily waived his *Miranda* rights.  He was 20 years old at the time of

12  the interview (Ans., Ex. C at 12), and he had been living in the United States since he was 8

13  years old (*id.*, Ex. B, Vol. 4 at 142).  Petitioner graduated from high school in the U.S.,

14  attended junior college here and received good grades in his classes (*id.*, Ex. B, Vol. 3 at

15  88–89).  Also, he worked for a mortgage company on a commission basis (*id.*, Ex. C at 12).

16  Despite Petitioner's assertion that Blank pressured him to give his side of the story, there is

17  no evidence of official compulsion or coercion, and therefore there can be no finding of

18  involuntariness.  *See Connelly*, 479 U.S. at 170.  Accordingly, Petitioner's claim is DENIED.

19  **III.    Admission of Custodial Statements to Officer Recinos**

20      Petitioner claims that the trial court violated his Fifth Amendment rights when it

21  denied a motion to suppress statements he made to Officer Recinos while outside Ai's

22  grandmother's house on January 4, 2005.  (Pet., P. & A. at 59–61.)  He asserts that because

23  he was handcuffed during the questioning, he was in custody at such time.  As he was in

24  custody during questioning, his statements were taken in violation of *Miranda*, and the trial

25  court's admission of the statements was constitutionally erroneous.  (*Id.*)  The trial court

26  ruled that Petitioner was not in custody when the statements were made, and admitted three

27  statements Petitioner made to Recinos, which were presented to the jury as a stipulation by

28

United States District Court
For the Northern District of California

1   the parties.  These statements were:  (1) Petitioner knew Ai; (2) he initially denied having sex

2   with her; and (3) he later admitted having sex with her.  (Ans., Ex. C at 13.)

3        The facts relevant to the question of custody are as follows:

4        While on patrol, Officer Recinos received notification of a possible burglary
         and was told that the reporting party also had mentioned a sexual assault the
5        day before.  Arriving at the house, Recinos observed [Petitioner], who matched
         the suspect's description, standing across the street.  Recinos "[s]topped [his]
6        patrol car, exited, directed [Petitioner]'s attention towards [him], and just
         talked to him."  Recinos did not draw his gun, but did place [Petitioner] in
7        handcuffs. As he did so, Recinos explained "that there was a disturbance at a
         house across the street, that possibly [Petitioner]'s associated with it, and for
8        his safety and for [Recinos's] own safety [he] was going to need to put him into
         handcuffs."  At no point did Recinos suggest that [Petitioner] was under arrest.
9        He did, however, converse with [Petitioner].  Recinos explained that a young
         lady had reported a burglary, explained that the police were investigating, and
10       asked [Petitioner] if he was aware of the details.  Upon learning that the
         reporting party was [Petitioner]'s girlfriend, Recinos asked follow-up questions
11       and the conversation continued.  [Footnote removed.]

12       The "casual conversation" took place over the course of 30 minutes but was not
         continuous.  [Petitioner], who was standing on the sidewalk, was in handcuffs
13       during the entirety of the conversation.  Recinos was with him the entire time,
         as was one additional officer who did not engage [Petitioner] in conversation.
14       Recinos eventually received information that the sexual assault report had been
         confirmed and that [Petitioner] was going to be arrested.  At that point, Recinos
15       asked [Petitioner] no further questions.  A different officer took custody of
         [Petitioner] and transported him to the station.

16

17  (*Id.* at 14–15.)

18       The state appellate court rejected Petitioner's claim, and affirmed the trial court's

19  determination that Petitioner was not in custody at the time:

20       Several factors indicate that defendant was not in custody for purposes of
         *Miranda*.  At the time of his conversation with Recinos, defendant was not
21       under arrest, he was standing in the same spot on the sidewalk at which he was
         initially approached, only two officers stood nearby and only one officer
22       questioned him, no guns were drawn, the questioning was casual and
         conversational, and there is no evidence that Recinos was "aggressive,
23       confrontational, and/or accusatory."  Additionally, custody generally "does not
         include a temporary detention for investigation.
24

25  (*Id.* at 15.)

26       *Miranda* protections are triggered "only where there has been such a restriction on a

27  person's freedom as to render him 'in custody.'"  *Oregon v. Mathiason*, 429 U.S. 492, 495

28

No. C 08-04686 LHK (PR)
ORDER DENYING PETITION

(1977).  Whether a person is in "custody or otherwise deprived of his freedom of action in any significant way," *Miranda*, 384 U.S. at 444, is answered by reviewing the totality of facts involved at the time of the alleged restraint."  *U.S. v. Redlightning*, 624 F.3d 1090, 1103 (9th Cir. 2010) (citing *U.S. v. Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001)).  Relevant to this inquiry are (1) the language used by the officer to summon the individual, (2) the extent to which he or she is confronted with evidence of guilt, (3) the physical circumstances of the interrogation, (4) the duration of the detention and (5) the degree of pressure applied to detain the individual.  *Id.*  Moreover, these factors are not exhaustive, as other factors may be pertinent to, or even dispositive of, the custody question.  *U.S. v. Bassignani*, 560 F.3d 989, 996 (9th Cir. 2009).  "Based upon a review of all the pertinent facts, a reviewing court must determine whether a reasonable innocent person in such circumstances would conclude that after brief questioning he or she would not be free to leave."  *U.S. v. Booth*, 669 F.2d 1231, 1235 (9th Cir. 1981).

Applying these legal principles to the instant matter, the Court concludes that the state court's determination that Petitioner was not in custody was not unreasonable, as an analysis under the *Redlightning* factors demonstrates.  The first factor, the summoning language, weighs in favor of the state court's determination.  Specifically, the record shows that Officer Recinos merely directed Petitioner, who had been standing across the street from Ai's grandmother's house, to him.  There is no evidence that Recinos was aggressive or accusatory, either physically or verbally, and Recinos made it clear that Petitioner was not under arrest at that time.  Rather than aggressively questioning Petitioner as a suspect, it appears that Recinos was asking questions of a person near to the crime scene.  The second and third factors also support the state court's decision.  The record shows that Recinos did not confront Petitioner with evidence of his guilt.  Rather, Recinos informed him that the police were investigating a report of a disturbance, and asked Petitioner questions related to that investigation.  Recinos informed Petitioner that he was in handcuffs for safety reasons and not because he was under arrest.  The fourth factor, the length of the detention, also

No. C 08-04686 LHK (PR)
ORDER DENYING PETITION

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   supports the state court's decision.  Petitioner was questioned for about thirty minutes,

2   which, though not exactly brief, was not unreasonably long, considering that Petitioner's

3   having admitted to knowing Ai gave Recinos reason to extend the questioning.

4       The last factor, however, does not unambiguously support the state court's decision.

5   Handcuffing Petitioner raises serious concerns whether, per *Miranda*, a reasonable innocent

6   person in such circumstances would conclude that after brief questioning he would be free to

7   leave.  Handcuffing, however, "does not necessarily dictate a finding of custody," but must

8   be considered along with other factors in assessing the ultimate question of custody.  *U.S. v.*

9   *Booth*, 669 F.2d 1231, 1236 (9th Cir. 1981) (citing *U.S. v. Purry*, 545 F.2d 217, 220 (D.C.

10  Cir.1976).  In the instant matter, the circumstances of the handcuffing support the conclusion

11  that Petitioner was not in custody.  "Strong but reasonable measures to insure the safety of

12  the officers or the public can be taken without necessarily compelling a finding that the

13  suspect was in custody."  *See U.S. v. Coades*, 549 F.2d 1303, 1305 (9th Cir. 1977).  Here, the

14  record supports the conclusion that Recinos took a reasonable safety measure, and informed

15  Petitioner why he was being handcuffed.  Based on the totality of the circumstances

16  discussed above, the Court concludes that the factors support the state court's decision,

17  especially considering that the record supports the officer's assertion that Petitioner was

18  handcuffed for safety reasons, and that the questioning was not accusatory or aggressive.

19  Petitioner's claim is denied because he has not shown that the state appellate court's

20  determination that he was not in custody was constitutionally erroneous, and therefore he has

21  not shown that his Fifth Amendment rights were violated.

22      Furthermore, even if Petitioner had shown that he was in custody, he has not shown

23  that he was prejudiced by the admission of the statements.  The statements convey

24  information duplicative of well-known facts undisputed at trial:  that Petitioner knew Ai, and

25  that he had had sex with her.  The statements to Recinos also show, however, that Petitioner

26  changed his story by at first denying and then admitting that he had had sex with Ai.  While

27  this evidence of deception may have worked against him at trial, it is not enough on its own

28

United States District Court
For the Northern District of California

1  to demonstrate prejudice, considering the strength of the testimonial and physical evidence

2  (Petitioner's semen on Ai's underwear, injuries to Petitioner's mouth and neck) adduced

3  against Petitioner at trial.  Accordingly, Petitioner's claim is DENIED.

4  **IV.   Restriction of Examination of Defense Witness**

5        Petitioner claims that the trial court violated his right to due process when it curtailed

6  his examination of his expert witness, Dr. Amanda Gregory.  (Pet, P. & A. at 74.)  In an *in*

7  *limine* ruling, the trial court ordered that Gregory's testimony could not contain two

8  categories of proposed evidence, which were (1) her opinion of Petitioner's comprehension

9  of specific words used in the police interview, and (2) the content of Petitioner's responses to

10  her questions.  Any testimony regarding the first category would be "speculation or

11  conjecture," because the "ability to determine if a person a year previous did or did not

12  understand a question or questions lacks any scientific foundation."  (Ans., Ex. C at 18.)  As

13  to the second category, the trial court excluded as hearsay any testimony that reiterated

14  Petitioner's responses.  (*Id.*)

15        The state appellate court rejected Petitioner's claim, finding that "both prongs of the

16  trial court's ruling are well-supported."  (*Id.* at 19.)  Gregory's testimony on Petitioner's

17  comprehension during the police interview was "appropriately excluded" because it was

18  "based on speculation and conjecture," and certainly "beyond the scope of legitimate expert

19  testimony."  (*Id.*)  Petitioner was free at trial, in the appellate court's opinion, to ask

20  questions regarding Gregory's more general opinion.  As to the second prong, the state

21  appellate court concluded that such testimony would function as a channel by which Gregory

22  could place out-of court statements before the jury, rather than just as a basis for her expert

23  opinion.  (*Id.* at 19–20.)

24        The exclusion of evidence does not violate the Due Process Clause unless "it offends

25  some principle of justice so rooted in the traditions and conscience of our people as to be

26  ranked as fundamental."  *Montana v. Egelhoff*, 518 U.S. 37, 42 (1996).  "While the

27  Constitution prohibits the exclusion of defense evidence under rules that serve no legitimate

28

United States District Court
For the Northern District of California

1   purpose or that are disproportionate to the ends that they are asserted to promote,

2   well-established rules of evidence permit trial judges to exclude evidence if its probative

3   value is outweighed by certain other factors such as unfair prejudice, confusion of the issues,

4   or potential to mislead the jury." *Holmes v. South Carolina*, 547 U.S. 319, 325–26 (2006).

5   Petitioner has not shown that the trial court's *in limine* ruling violated his right to due

6   process, or that the ruling resulted in prejudice. Rather, the record shows that the trial court's

7   exercise of its discretion was not unconstitutional. First, the record supports the state

8   appellate court's conclusion that the trial court reasonably excluded as speculative and

9   conjectural Gregory's testimony regarding Petitioner's comprehension of words. As noted,

10  Petitioner's police interview occurred a year before, and was not witnessed by Gregory.

11  Second, the record supports the state appellate court's affirmation of the trial court's

12  exclusion of Gregory's testimony regarding Petitioner's actual statements. It is reasonable to

13  infer that allowing such testimony would act as a channel to put Petitioner's hearsay

14  statements before the jury without being tested on cross-examination. Furthermore, Gregory

15  could, and did, testify as to her general opinion of Petitioner's ability to comprehend, Ans.,

16  Ex. B at 335–51, and defense counsel reiterated such points in closing argument, *id.* at

17  476–78. While Petitioner may not have been able to present all the evidence in the exact

18  way he wished, Gregory was able to testify as to her general opinion. Accordingly,

19  Petitioner's

20  is DENIED.

21  **V.    Alleged Prosecutorial Misconduct**

22  Petitioner claims that the prosecutor committed two acts of misconduct, violating

23  Petitioner's right to due process thereby. (Pet., P. & A. at 94–96.) The first instance

24  occurred when the prosecutor commented on Ai's credibility, and the second instance

25  occurred when the prosecutor summarized the reasonable doubt standard. (*Id.*)

26  A defendant's due process rights are violated when a prosecutor's misconduct renders

27  a trial "fundamentally unfair." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Under

28

No. C 08-04686 LHK (PR)
ORDER DENYING PETITION

United States District Court
For the Northern District of California

Darden, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness so that there was a due process violation. *Tan v. Runnels*, 413 F.3d 1101, 1112 (9th Cir. 2005). In order to prevail on federal habeas review, the prosecutor's misconduct must have resulted in prejudice, that is, the misconduct must have had a substantial and injurious effect or influence in determining the jury's verdict. *Johnson v. Sublett*, 63 F.3d 926, 929 (9th Cir. 1995) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)).

### A.    Comment on Ai's Credibility

The state appellate court summarized the facts and its holding as follows:

> During closing argument in this case, the prosecutor emphasized the consistency of Ai's statements — to the police, at the preliminary hearing, and at trial. The prosecutor continued: "When you listen to the CD [of the police interview], if you want to listen to the CD, you'll hear Sergeant Blank state when people tell the truth they tell the truth the same way each and every way. And that's what we have here. Ai telling the truth the same way each and every way . . . " Defense counsel interjected with the objection that Blank did not introduce this evidence, and the court observed that "[t]he jury will decide what the facts are."

> [Petitioner] equates the prosecutor's statement with an inadmissible opinion on the veracity of Ai's testimony and contends the statement amounts to misconduct. We disagree. A prosecutor's statement that vouches for the credibility of a witness is improper. In this case, however, the prosecutor pointed to Blank's comment as shorthand for the proposition that if a witness's statements are consistent, the story is more likely to be truthful. The observation that Ai's story was consistent, and thus appeared truthful, was a fair comment on the evidence presented, and not a statement of personal knowledge regarding Ai's truthfulness . . .

> [Petitioner] also contends that the statement constituted misconduct "because the prosecutor was arguing evidence outside the (non-substantive) purpose for which it was admitted[.]" We do not believe that a jury would have understood the prosecutor's argument to indicate that Blank's observation regarding consistency was made with respect to Ai's testimony. Moreover, unlike the statements discussed in [Petitioner]'s supporting authorities, the remark at issue did not refer to facts not before the jury . . . Finally, the trial court reminded the jury that it was its province to determine the facts of the case, which includes whether Ai was consistent and truthful. In these circumstances, we conclude it is unlikely that the jury would have construed the prosecutor's remarks regarding truth and consistency in an objectionable fashion.

(Ans., Ex. C at 21–23).

Improper vouching for the credibility of a witness occurs when the prosecutor places

United States District Court
For the Northern District of California

1  the prestige of the government behind the witness or suggests that information not presented

2  to the jury supports the witness's testimony. *U.S. v. Young*, 470 U.S. 1, 7 n.3, 11–12 (1985);

3  *U.S. v. Parker*, 241 F.3d 1114, 1119–20 (9th Cir. 2001).

4  Petitioner has not shown that the prosecutor's remarks were improper, and certainly

5  has not shown that such remarks, even if improper, resulted in prejudice.  As to the first part

6  of the *Darden* analysis, the record supports the state appellate court's conclusion that the

7  prosecutor's remark was not improper vouching.  Rather, it was a general comment that a

8  witness's story is more likely to be truthful when that witness repeatedly gives a consistent

9  account of events.  Such comment is not placing the prestige of the government behind a

10  witness or suggesting that unpresented evidence supported Ai's testimony.  Furthermore,

11  even if the remark has been shown to be improper, there has been no showing of prejudice.

12  In the instant matter, the trial court admonished the jury in its general instructions (and after

13  defense counsel made the above objection) that the jury was the sole arbiter of credibility.

14  (Ans., Ex. A, Vol. 2 at 240.)  Jurors are presumed to follow their instructions, *see Richardson*

15  *v. Marsh*, 481 U.S. 200, 206 (1987), and when a curative instruction is issued, a court

16  presumes that the jury has disregarded the inadmissible evidence or improper statement and

17  that no due process violation occurred, *see Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987).

18  This presumption may be overcome if there is an "overwhelming probability" that the jury

19  would be unable to disregard evidence and a strong likelihood that the effect of the

20  misconduct would be "devastating" to the defendant.  *Id.*  Petitioner's mere allegation is

21  insufficient to establish an "overwhelming probability" that the jury was unable to disregard

22  the evidence or that there was a strong likelihood that the effect of the comments would be

23  devastating to him.  Accordingly, Petitioner's claim is DENIED.

24  **B.  Reasonable Doubt**

25  Petitioner's claim is based on the following statement by the prosecutor regarding

26  reasonable doubt:

27  If you have a doubt and you can explain to yourself why you have that doubt,

28

No. C 08-04686 LHK (PR)
ORDER DENYING PETITION

United States District Court
For the Northern District of California

1
2
3
4
5
6
7

reasonable explanation, that's a reasonable doubt.  If you have something gnawing at you but you can't explain why, there's no reason for it, that would not be a reasonable doubt . . . Reasonable doubt] *[m]ust be based on the evidence.*  What that means is if you start asking yourself, well, what about this, or what if that, they didn't do this, they didn't do that, I wonder what that would show, stop yourself.  You're limited to the evidence presented in this case and either that's reasonable doubt or it's not, but you can't speculate what other evidence that has not been presented might show.  You're limited to what the evidence showed in this case that we've admitted into evidence . . . *Conflicts in the evidence are not reasonable doubt*, and the reasons for that is your main job in this case is to evaluate credibility.  So if one person says one thing and another person says another thing, that's not reasonable doubt.  You're to determine which person you find credible, which person you believe.

8
9
10
11
12

(Ans., Ex. C at 23–24) (italics added by state appellate court).  The state appellate court rejected Petitioner's claim, concluding that although the prosecutor was incorrect that there must be evidence to support reasonable doubt, his statement was "ambiguous" and "not part of a larger trend of misconduct."  Indeed, the ambiguous language appeared "in the midst of several inarguably correct statements regarding the reasonable doubt standard."  (*Id.* at 24.)

13
14
15
16
17
18
19
20
21
22
23
24
25
26

Petitioner's claim fails.  First, it is procedurally defaulted because defense counsel failed to object at trial.  (*Id.* at 23.)  Because Petitioner failed to sufficiently object at trial and seek admonishments, the claim is procedurally defaulted, and therefore barred from federal habeas review, under the contemporaneous rule.  *See Coleman v. Thompson*, 501 U.S. 772, 749–50 (1991), and *Paulino v. Castro*, 371 F.3d 1083, 1092–93 (9th Cir. 2004).  Second, Petitioner's claim fails on the merits.  Not only was the comment ambiguous, but, as the state appellate court found, it appeared among a discussion of the correct reasonable doubt standard.  Also, the trial court (1) gave the correct instructions on reasonable doubt and (2) instructed the jury that it was to follow the court's instructions, even if the attorneys gave a different version of the law.  Jurors are presumed to follow their instructions.  *See Marsh*, 481 U.S. at 206.  Petitioner's mere allegation is insufficient to establish an "overwhelming probability" that the jury was unable to disregard the evidence or that there was a strong likelihood that the effect of the comments would be devastating to him.  Accordingly, Petitioner's claim is DENIED.

27

//

28

1  //

## VI.   Alleged Cumulative Error

Petitioner claims that he is entitled to habeas relief because there was cumulative error. (Pet., P. & A. at 119.)  The state appellate court rejected this claim, finding no prejudicial impact of any possible errors at trial.  (Ans., Ex. C at 25.)

Although no single trial error is sufficiently prejudicial to warrant the granting of relief, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned.  *See Alcala v. Woodford*, 334 F.3d 862, 893–95 (9th Cir. 2003).  As Petitioner has not shown that any errors existed, there can be no cumulative effect resulting in prejudice.  *Id.*  Accordingly, Petitioner's claim is DENIED.

## VII.   Denial of Continuance

Petitioner claims that the trial court violated his right to due process rights and his Sixth Amendment right to counsel when it denied his motion for a continuance before he was sentenced.  (Pet., P. & A. at 120.)  The relevant facts are as follows:

The court entered judgment on January 12, 2006, and set the matter for sentencing on March 3, 2006.  The sentencing hearing was continued three times (to accommodate the probation department, due to a scheduling conflict, and on behalf of the court) and was eventually held on April 21, 2006.  At the outset of hearing, defense counsel asked that the matter be continued for a "formal sentencing hearing."  Pressed for the reasons behind his request, counsel stated that it was necessary to "provide a separate time where we can hear from [Petitioner] and from Ai [ ] in some greater detail."  Counsel also referred to his misunderstanding that this was the "formal" sentencing hearing.

In denying defense counsel's request, the court referenced the following factors:  (1) [Petitioner] was free to address the court at the hearing; (2) [Petitioner] had previously declined the opportunity to speak with the probation officer; (3) the victim had made her views on punishment clear; (4) without Ai's personal appearance, the court would "take into consideration the victim is not interested in the maximum possible sentence in this matter"; (5) it would be inappropriate for the court to order Ai to be cross-examined or questioned regarding [Petitioner]'s punishment; (6) [Petitioner]'s sentencing had already been continued for two months; and (7) defense counsel had been given ample notice of the sentencing hearing.  Later in the hearing defense counsel reiterated his request for a continuance to present Ai's views on sentencing, but acknowledged that she had declined to appear on the original sentencing date.  In response, the court elaborated that it would "consider that she would, if called as a witness, would testify that she's encouraging the Court or recommending the Court very lenient sentence to the [Petitioner]."

United States District Court
For the Northern District of California

1    (Ans., Ex. C at 26–27.)

2           The state appellate court rejected Petitioner's continuance claim:

Despite the court's detailed reasons for denying the continuance request, and acknowledgment that it would assume the victim would recommend a lenient sentence, [Petitioner] argues the denial of the continuance denied him "due process of law and a fundamentally fair sentencing."  We do not agree. Counsel's misunderstanding that the sentencing hearing was the formal sentencing hearing does not provide good cause to continue the hearing. Defense counsel did not represent that he had insufficient time to examine the applicable sentencing structure.  Counsel had received and reviewed the probation report and, at the hearing, challenged the probation officer's recommendation; indeed, defense counsel called the probation officer to the stand and questioned her methodology and recommendations.  Additionally, counsel argued at length against the recommended sentence.  That defense counsel did not offer specific, persuasive objections to the recommended sentence does not establish that the court erred in denying the continuance.

We also find no abuse of discretion and no prejudice arising from the court's denial of the continuance to allow further opportunity to hear from the victim. Counsel had the opportunity prior to sentencing to approach Ai regarding attendance at the hearing, but did not.  Ai had, in fact, spoken with the probation officer and conveyed her opinion regarding [Petitioner]'s punishment, and, as defense counsel acknowledged, had informed the officer that she would not be attending the sentencing hearing.  In addition, the trial court mitigated any negative consequence that resulted from defense counsel's inability to obtain a further statement from Ai regarding [Petitioner]'s punishment.  The court's interpretation of the victim's wishes was, in fact, favorable to [Petitioner] as the transcript and probation report reveal that Ai's views on sentencing had only grown more punitive as the legal process progressed.

(*Id.* at 27–28.)

       To establish a constitutional violation based on the denial of a continuance motion, a petitioner must show that the trial court abused its discretion, which will be found if, after carefully evaluating all relevant factors, the denial was arbitrary or unreasonable.  *See Armant v. Marquez*, 772 F.2d 552, 556 (9th Cir. 1985).  In considering whether the denial of a continuance implicating a defendant's Sixth Amendment right to counsel is an abuse of discretion, the Ninth Circuit has applied the factors set forth in *U.S. v. Robinson*, 967 F.2d 287, 291 (9th Cir. 1992):  (1) whether the continuance would inconvenience witnesses, the court, counsel, or the parties; (2) whether other continuances have been granted; (3) whether legitimate reasons exist for the delay; (4) whether the delay is the defendant's fault; and

United States District Court
For the Northern District of California

(5) whether a denial would prejudice the defendant. *See U.S. v. Mejia*, 69 F. 3d 309, 314 (9th Cir. 1995). But the ultimate test remains whether the trial court abused its discretion through an "unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay." *Houston v. Schomig*, 533 F.3d 1076, 1079 (9th Cir. 2008) (quoting *Morris v. Slappy*, 461 U.S. 1, 11–12 (1983)) (internal quotation marks omitted).

Here, Petitioner has not shown that the state appellate court's adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, as an analysis under the *Mejia* factors demonstrates.

The first and second factors weigh in favor of Respondent. A further delay would likely inconvenience the court, counsel, and the parties, especially considering that the sentencing hearing had thrice been continued. The third factor weighs in favor of Respondent. The records supports the state appellate court's determination that there were no legitimate reasons for a delay. Petitioner was free to address the court at the hearing. He had declined a prior opportunity to speak with the probation officer. Ai had made her views on punishment, and the fact that she would not attend the hearing, known. The trial court would take into consideration that Ai was not interested in an imposition of the maximum sentence. The hearing had already been continued a few times. Defense counsel had had ample time to prepare for the hearing. There is insufficient evidence to determine whether the fourth factor is relevant. The fifth factor also weighs in favor of Respondent. As the reasons given under the discussion of the third factor demonstrate, there is nothing in the record to support a claim that Petitioner was prejudiced by the denial of the continuance. Nor is there anything to support the conclusion that the trial court abused its discretion through an "unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay." *Houston*, 533 F.3d at 1079. Accordingly, Petitioner's claim is DENIED.

No. C 08-04686 LHK (PR)
ORDER DENYING PETITION

United States District Court
For the Northern District of California

### VIII.   Imposition of Consecutive Sentences

The trial court imposed consecutive sentences for all five convictions.  (Ans., Ex. C at 1–2.)  Petitioner claims that the imposition of these consecutive sentences (1) violated his state statutory rights under Cal. Pen. Code § 654, (2) his federal due process rights, and (3) his right under the Double Jeopardy Clause.  (Pet., P. & A. at 133.)  The state appellate court rejected Petitioner's claims on state law grounds.  (Ans., Ex. C at 28–37.)

Petitioner's state law claim is foreclosed by case law.  The Supreme Court has repeatedly held that a federal habeas writ is unavailable for violations of state law or for alleged error in the interpretation or application of state law. *See Swarthout v. Cooke*, 131 S. Ct. 859, 862 (2011).  Petitioner's due process claim is also foreclosed.  "The decision whether to impose sentences concurrently or consecutively is a matter of state criminal procedure and is not within the purview of federal habeas corpus." *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994).  Petitioner's Double Jeopardy Clause claim is unavailing.  Petitioner suffered individual, not repeated, punishments for each crime.  Accordingly, Petitioner's claim is DENIED.

### IX.   Alleged Blakely Error

Petitioner claims that the trial court's imposition of consecutive terms without a specific finding by the jury violated his Sixth Amendment rights, as those rights are set forth in *Blakely v. Washington*, 542 U.S. 296 (2004) and *Cunningham v. California*, 549 U.S. 270 (2007), which are the progeny of *Apprendi v. New Jersey*, 530 U.S. 466 (2003).  (Pet., P. & A. at 184–89.)  The state appellate court rejected this claim on the same grounds as listed below.  (Ans., Ex. C at 37–38.)

Petitioner's claim is foreclosed by case law.  *Apprendi* and its related cases of *Blakely* and *Cunningham* do not apply to a trial court's decision to impose concurrent or consecutive sentences.  *See Oregon v. Ice*, 129 S.Ct. 711, 714–15 (2009).  As *Ice* holds, those cases impose constitutional limits on increasing the statutory maximum sentence of a single conviction, and have nothing to say about the imposition of consecutive sentences for

No. C 08-04686 LHK (PR)
ORDER DENYING PETITION

1    convictions on separate charges.  Accordingly, Petitioner's claim is DENIED.

2                                          **CONCLUSION**

3            Accordingly, all Petitioner's claims, and therefore the petition, are DENIED because

4    Petitioner has failed to show that there was "no reasonable basis for the state court to deny

5    relief," *Richter*, 131 S.Ct. at 784, that is, he has not shown that the state appellate court's

6    decision on direct review as to any of the above claims was contrary to, or involved an

7    unreasonable application of, clearly established Supreme Court precedent.

8            A certificate of appealability will not issue.  Reasonable jurists would not "find the

9    district court's assessment of the constitutional claims debatable or wrong."  *Slack v.*

10   *McDaniel*, 529 U.S. 473, 484 (2000).  Petitioner may seek a certificate of appealability from

11   the Court of Appeals.

12           The Clerk shall enter judgment in favor of Respondent and close the file.

13           **IT IS SO ORDERED.**

14   DATED:  August 11, 2011                    _Lucy H. Koh_
                                          _____
15                                              LUCY H. KOH
                                          United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28

                                                   No. C 08-04686 LHK (PR)
                                                   ORDER DENYING PETITION

**United States District Court**
For the Northern District of California